1

2                       UNITED STATES DISTRICT COURT

3                  FOR THE NORTHERN DISTRICT OF CALIFORNIA

4                              OAKLAND DIVISION

5

6    MARK R. WILKES,                          Case No:  C 04-3030 SBA

7              Petitioner,                    **ORDER DENYING PETITION FOR
                                              WRIT OF HABEAS CORPUS**
8         vs.

9    THOMAS L. CAREY, Warden,

10             Respondent.

11

12        This matter is now before the Court for consideration of Petitioner's Petition for

13   Writ of Habeas Corpus, pursuant to 28 U.S.C. § 2254.  Through counsel, Petitioner seeks to

14   challenge his 2001 state court conviction and sentence for attempted murder, assault with a

15   deadly weapon and corporal injury to his spouse.  Respondent has filed an Answer to the

16   Petition and Petitioner has filed a Traverse.  For the reasons discussed below, the Petition is

17   DENIED as to all claims.

18   I.    **BACKGROUND**

19        A.    **PROCEDURAL SUMMARY**

20             1.    **State Court Proceedings**

21        On November 1, 2001, the Mendocino County District Attorney filed an amended

22   information charging Petitioner with:  (1) the attempted murder of his wife Laurel Wilkes

23   ("Laurel") and their friend William Egan Brunson ("Brunson") in violation of Penal Code[1]

24   §§ 664/187 (counts one and three); (2) assault with a deadly weapon in violation of Penal

25   Code § 245(a) (counts two and five); and (3) corporal injury to a spouse in violation of

26   Penal Code § 273.5(a) (count four).  As to counts one and two, the information alleged that

27

28        [1] All Penal Code references are to the California Penal Code.

1  Petitioner inflicted great bodily injury, Cal. Penal Code § 12022.7(a); as to counts one,

2  three and four, the information alleged that Petitioner used a deadly weapon (hammer), id.

3  § 12022(b)(1); and as to counts three, four and five, that Petitioner inflicted great bodily

4  injury under circumstances involving domestic violence, id. § 12022.7(e).  CT 64-69.

5        On November 19, 2001, a jury found Petitioner guilty on counts one, two, four and

6  five, and found true the special allegations.  The jury returned a not guilty verdict on count

7  three (attempted murder of Laurel).  CT 216-229.  On January 11, 2002, the trial court

8  sentenced Petitioner to a term of sixteen years in prison.  CT 322-323.

9        Petitioner appealed his conviction to the California Court of Appeal, which, in an

10  unpublished disposition, affirmed his conviction and sentence on February 27, 2003.

11  Respt. Ex. H.  The court summarily denied Petitioner's petition for rehearing on March 21,

12  2003.  Id. Exs. I, J.  The California Supreme Court issued a summary denial of his petition

13  for review on May 14, 2003.  Id. Ex. K, L.

14        Petitioner sought habeas relief in the state Court of Appeal, which denied relief on

15  February 27, 2003.  Id. Exs. M, N, O.  The California Supreme Court denied relief on June

16  18, 2003.  Id. Ex. Q, R.

17            **2.**   **Federal Court Proceedings**

18        On July 27, 2004, Petitioner filed the instant Petition for Writ of Habeas Corpus.

19  Dkt. 1.  Upon filing, the case was assigned to the Honorable Martin Jenkins, who issued an

20  Order to Show Cause on March 5, 2005.  Dkt. 3.  Briefing on the Petition was complete

21  upon Petitioner's filing of his Traverse on October 19, 2005.  Dkt. 16.  Judge Jenkins did

22  not rule on the merits of the Petition.

23        On April 8, 2008, the action was reassigned to the Honorable Jeremy Fogel

24  following Judge Jenkins' departure from this Court.  Dkt. 17.  Judge Fogel departed from

25  this Court in 2011 without ruling on the Petition.  As a result, the case was reassigned to

26  this Court on September 28, 2011.  Dkt. 19.  The Court finds the Petition ripe for

27  adjudication.

28

**B.** **FACTUAL SUMMARY**

**1.** **The Underlying Incident**

The parties are familiar with the facts of this case, which are summarized herein from the Court of Appeal's unpublished disposition, only to the extent that relate to the issues raised in the Petition.  Respt. Ex. H.

Petitioner and Laurel married in or about 1984 and together had three children. Petitioner and Laurel led a "Swingers' Lifestyle," which involved sexual encounters with persons outside their marriage.  Brunson, a friend of Petitioner's through work, eventually participated in such encounters with Petitioner and Laurel.  Brunson used condoms when having sex with Laurel; Petitioner previously had a vasectomy and did not use them.

On July 3, 2001, Brunson arrived at the Petitioner and Laurel's home in Ukiah to spend the Fourth of July weekend with them.  That evening, Brunson slept on the couch in the living room.  At around 11:00 p.m., he overheard Petitioner and Laurel arguing in their bedroom.  Petitioner left the house, returned, but then left again around midnight.

The next day, July 4, 2001, Petitioner returned home at around 5:00 p.m. as Brunson, Laurel and the children were loading the car for a holiday barbeque and fireworks display.  Petitioner, who was upset, spoke with Brunson, but not Laurel or the children. Petitioner left in his truck, still upset.  Laurel nonetheless decided that they should go to the picnic without Petitioner.  Laurel, Brunson and the children returned home at around 10:00 p.m.  Once inside, Brunson found a knife and a marker embedded in the bedroom wall. The knife held two condom wrappers.  Nearby, a message had been written on the wall calling Laurel a "whore."  On the answering machine was a message from Petitioner.

Laurel and Brunson later summoned the police, who arrived at around 1:00 a.m. on July 5.  The responding officer observed the written statement on the wall and the knife with the condom wrappers.  The officer also listened to the answering machine message in which the caller threatened to drive a vehicle through the house, threatened to burn the house down rather than allow Laurel to live there without him and accused her of using sex as a weapon.  Laurel and Brunson informed the officer that they believed that Petitioner

1  was responsible for the message and the vandalism.  Although the officer advised Brunson

2  and Laurel to stay elsewhere for the evening, they declined to do so because they had

3  nowhere else to stay.  However, Laurel said she would seek a protective order the next day

4  in accordance with the officer's recommendation.  The officer left the house with the knife,

5  and Laurel and Brunson secured the house.

6      Laurel and Brunson eventually fell asleep but awoke up hearing the sound of

7  breaking glass.  Petitioner entered the room where Laurel and Brunson were staying and

8  ran towards them with his arms raised as if he were about to attack.  Brunson grabbed

9  Petitioner's arm in an attempt to restrain him and realized that he was armed.  Petitioner

10  then hit Brunson on the head with a rock hammer, causing him to bleed profusely and fall

11  to his knees.  Petitioner hit Brunson two more times while he was on the ground.

12  Meanwhile, Laurel was screaming and trying to reach for a telephone.  Petitioner used his

13  hammer to attack Laurel, prompting Brunson to get up and come to Laurel's defense.

14  Petitioner then tried to attack Brunson, who was able to disarm him.  Brunson suffered

15  further blows to the head and chest.  However, Brunson was able to restrain Petitioner by

16  lying on top of him.

17      Five officers arrived at Petitioner and Laurel's home in response to a distress call

18  received at around 3:00 a.m.  The officers heard scuffling and yelling from inside the house

19  and demanded entry.  Brunson yelled back that he could not open the door because he was

20  restraining Petitioner.  The officers went to the back of the house and gained entry through

21  the glass sliding door which had been shattered.  Once Brunson saw the police arrive, he

22  told Petitioner, "It's over."

23      The police officers observed that Brunson had blood all over his face, head and

24  neck.  Brunson informed the officers that Petitioner had attacked him with a hammer.

25  Laurel was crying and distraught with the children, who also were upset, in a bedroom.

26  Laurel was bleeding from her head from a laceration near a bump on her head.  Laurel

27  reported that Petitioner had hit her with an object.  The officers arrested Petitioner, and

28  found a hammer wet with blood about five feet from him.  Inside Petitioner's truck, which

1  was parked about one-quarter to one-third of a mile from the residence, the officers found a

2  vodka bottle.  Brunson suffered a skull fracture and neurological damage.  Laurel suffered a

3  laceration to her scalp, a skull fracture and bruising and swelling.  All three were taken to

4  the hospital and treated.

5              **2.       Investigation and Pretrial Matters**

6        On July 6, 2001, Robert Simerson ("Simerson"), an investigator for the prosecution,

7  interviewed Petitioner at the county jail.[2]  He admitted to Simerson that he had been

8  drinking and that he had stuck the knife in the wall and that he wrote the message on the

9  wall of his home.  After doing so, he climbed onto the roof of his house and waited for

10  Brunson and Laurel to arrive home from the picnic so that he could see their reaction.

11  After the police came and left, he got off the roof and tried to gain entry to the house.

12  Finding that the doors had been locked and barricaded, Petitioner used a hammer from his

13  toolbox and broke the glass on the sliding glass door to gain entry to the house.  Petitioner

14  claims that he was angry at Laurel for calling the police, and that he intended to tell her

15  how much she had hurt him.  Petitioner entered the living room, where he saw Laurel and

16  Brunson on the couch.  While admitting to their three-way sexual relationship, Brunson

17  denied being angry or jealous.  When Brunson and Laurel awoke, Brunson came at him and

18  reached for the hammer.  Petitioner admitted hitting Brunson with the hammer, but could

19  not recall whether he struck Laurel.[3]

20        A jury trial commenced on November 13, 2001.  Petitioner was represented by

21  deputy public defender Garry Preneta.  Petitioner and Brunson, among others, testified at

22  trial, though Laurel did not.  On November 19, 2001, the jury found Petitioner guilty of the

23  attempted murder of Brunson and found true the allegations that he used a deadly weapon

24  and inflicted great bodily injury during the commission of this offense.  Petitioner also was

25  found guilty of assault with a deadly weapon and the allegation that he inflicted great

26

27        [2] Petitioner was <u>Mirandized</u> and the interview was videotaped.

        [3] On July 10, 2001, Brunson gave a statement to Detective Kevin Devries during
28  which he denied being in a consensual sexual relationship with Laurel and Brunson.

1  bodily injury during the commission of the offense was found true.  As to the charges

2  involving Laurel, the jury found Petitioner guilty of corporal injury to a spouse and found

3  true allegations that he used a deadly weapon during the commission of the offense; and

4  guilty of assault with a deadly weapon and infliction of great bodily injury during the

5  commission of the offense.  However, the jury acquitted Petitioner of the attempted murder

6  of Laurel.  On January 11, 2002, the trial court sentenced Petitioner to a total of sixteen

7  years in prison.

8  **II.    STANDARD OF REVIEW**

9      The instant Petition is governed by the Antiterrorism and Effective Death Penalty

10  Act of 1996 ("AEDPA"), 28 U.S.C. § 2254.  Under AEDPA, a federal court cannot grant

11  habeas relief with respect to any claim adjudicated on the merits in a state-court proceeding

12  unless the proceeding "resulted in a decision that was *contrary to*, or involved an

13  *unreasonable application of*, clearly established Federal law, as determined by the Supreme

14  Court of the United States."  28 U.S.C. § 2254(d)(1) (emphasis added).

15      A state court decision is "contrary to" clearly established federal law "if the state

16  court applies a rule that contradicts the governing law set forth in [Supreme Court] cases or

17  if the state court confronts a set of facts that are materially indistinguishable from a

18  decision of [the Supreme] Court and nevertheless arrives at a result different from [its]

19  precedent."  Lockyer v. Andrade, 538 U.S. 63, 73 (2003) (internal quotation marks

20  omitted).

21      Relief under the "unreasonable application" clause is appropriate "if the state court

22  identifies the correct governing legal principle from [the Supreme] Court's decisions but

23  unreasonably applies that principle to the facts of the prisoner's case."  Id.   Habeas

24  petitioners bear the burden of showing that a state court's decision applied some Supreme

25  Court precedent in an objectively unreasonable manner.  Woodford v. Visciotti, 537 U.S.

26  19, 25 (2002) (per curiam).

27      In determining whether a state court's decision is contrary to, or involves an

28  unreasonable application of, clearly established federal law, courts in this Circuit look to

1  the decision of the highest state court to address the merits of the petitioner's claim in a

2  reasoned decision.  See Ylst v.Nunnemaker, 501 U.S. 797, 803-804 (1991); LaJoie v.

3  Thompson, 217 F.3d 663, 669 n.7 (9th Cir. 2000).  Moreover, "a determination of a factual

4  issue made by a State court shall be presumed to be correct," and the petitioner "shall have

5  the burden of rebutting the presumption of correctness by clear and convincing evidence."

6  28 U.S.C. § 2254(e)(1).

7  **III.    LEGAL CLAIMS**

8      **A.    CLAIM ONE: ADMISSION OF VIDEOTAPE TO IMPEACH BRUNSON**

9      Petitioner alleges that the trial court violated his constitutional right to confrontation

10  and due process by denying his request to introduce a videotaped interview of Brunson by

11  Detective Devries.  Petitioner contends that he should have been allowed to play a portion

12  of the interview to impeach Brunson's trial testimony, his credibility and his demeanor.

13  Petition at 12-13.  In particular, Petitioner claims that while Brunson was tearful at trial, he

14  was calm during the videotaped interview.  Petitioner also contends that Brunson lied

15  during the interview about his relationship with Laurel and that he offered conflicting

16  accounts regarding whether the room where the attack took place was illuminated.  Id.[4]

17      The Confrontation Clause of the Sixth Amendment provides that in criminal cases

18  the accused has the right to "be confronted with the witnesses against him."  U.S. Const.

19  amend. VI.  "Generally speaking, the Confrontation Clause guarantees an opportunity for

20  effective cross-examination, not cross-examination that is effective in whatever way, and to

21  whatever extent, the defense might wish."  Delaware v. Fensterer, 474 U.S. 15, 20 (1985).

22  The denial of a criminal defendant's opportunity to impeach a witness in violation of the

23  Confrontation Clause does not justify habeas relief unless the error had "substantial and

24  injurious effect or influence in determining the jury's verdict."  O'Neal v. McAninch, 513

25  U.S. 432, 436 (1995); see also Mammal v. Van de Camp, 926 F.2d 918, 919 (9th Cir. 1991)

26  _____

27      [4] In fact, the trial court repeatedly stated that it would allow defense counsel to play the videotape during Petitioner's case in chief, though counsel did not do so.  RT 281, 291. The court also allowed defense counsel to use a portion of the tape to refresh Brunson's

28  recollection, RT 336, and re-cross-examination, RT 371-72.

1  (noting that evidentiary errors do not justify habeas relief unless they "so fatally infected

2  the proceedings as to render them fundamentally unfair.").

3      Here, Petitioner contends that the videotape would have allowed him to "impeach"

4  Brunson's demeanor on the witness stand.  However, Petitioner was readily able to

5  establish the difference between his in-court demeanor and his demeanor during the

6  interview *without* playing the videotape.  At the start of his cross-examination of Brunson,

7  defense counsel established that Brunson was not crying when he was interviewed by

8  Detective Devries and was not "unreasonably upset" at that time because he was on

9  medication.  RT 260-63, 333.  When the prosecution objected to defense questions on

10  relevance grounds, defense counsel countered that such questions went to "his attitude and

11  demeanor on the stand now[.]"  RT 263.  The trial court overruled the prosecution's

12  objection and allowed Brunson to respond to defense counsel's questions.  Id.  As such, it is

13  clear from the record that, despite his claims to the contrary, Petitioner had a fair

14  opportunity to impeach Brunson's in-court demeanor without the videotape.

15      Likewise, defense counsel thoroughly cross-examined Brunson on inconsistencies in

16  his statements regarding his relationship with Laurel.  Specifically, on the witness stand

17  Brunson acknowledged being involved in a three-way relationship with Laurel and

18  Brunson, which he admittedly had lied about during his interview with Detective Devries.

19  RT 327-328.  In addition, defense counsel questioned Brunson about his statement to

20  Detective Devries that the struggle took place in the dark, and pointed out that Brunson was

21  now claiming that there were some lights which were switched on.  RT 280, 360-361.

22  Given Brunson's admissions that his trial testimony on these points were inconsistent with

23  his earlier statements to Detective Devries, it would have been cumulative to play the

24  videotape to establish the inconsistencies in Brunson's statements.  See Gonzalez v. Wong,

25  667 F.3d 965, 1020 (9th Cir. 2011) (holding that witness was "'extensively impeached'

26  based on his own admissions and willingness and motivation to lie" and that "secondary

27  evidence of his propensity to lie" was cumulative).

28

1    In sum, the record supports the conclusion that Petitioner was permitted to

2 effectively cross-examine Brunson in an effort to undermine his credibility.  As such, the

3 Court finds that there was no violation of Petitioner's constitutional rights as a result of his

4 inability to use the videotape during his cross-examination of Brunson.

5    **B.    CLAIM TWO:  ADMISSION OF PETITIONER'S INTERVIEW**

6     In his second claim for relief, Petitioner contends that the trial court erred in refusing to

7 admit a videotape of his interview with Simerson, the prosecution's investigator.  According to

8 Petitioner, the taped interview would have shown, through his statements and body language,

9 that he had no intention of harming anyone, that he was remorseful and that he accidently

10 attacked Laurel and Brunson with a hammer.  Petitioner contends that the trial court's refusal

11 to allow him to play the tape to the jury violated his constitutional right to present a defense

12 and right to due process.  Petition at 13-14.

13    Criminal defendants have a constitutional right under the Sixth Amendment to

14 present a defense; this right is a "fundamental element of due process of law." See

15 Washington v. Texas, 388 U.S. 14, 19 (1967).  This right is not absolute, however.  See

16 Alcala v. Woodford, 334 F.3d 862, 877 (9th Cir. 2003).  The exclusion of evidence does

17 not abridge a defendant's right to present a defense unless it is "arbitrary and

18 disproportionate" and "infringe[s] upon a weighty interest of the accused."  United States v.

19 Scheffer, 523 U.S. 303, 308 (1998).  Generally, it takes "unusually compelling

20 circumstances . . . to outweigh the strong state interest in administration of its trials."  Perry

21 v. Rushen, 713 F.2d 1447, 1450 (9th Cir. 1983).  The Supreme Court has repeatedly held

22 that the Constitution permits judges "to exclude evidence that is 'repetitive . . . , only

23 marginally relevant' or poses an undue risk of 'harassment, prejudice, [or] confusion of the

24 issues.'"  Crane v. Kentucky, 476 U.S. 683, 689-90 (1986).

25    In the instant case, the Court finds that Petitioner's constitutional rights were not

26 abridged by the trial court's appropriate refusal to allow Petitioner to play the videotape of

27 his interview for the jury.  At trial, Petitioner was able to elicit from Simerson that during

28 the interview, Petitioner expressed remorse and he had not intended to hurt Laurel or

1   Brunson.  RT 417-419.  Petitioner nonetheless argues that he should have been allowed to

2   play the videotape of the interview on the ground that it would have conveyed his

3   demeanor and body language during the interview.  However, Petitioner testified at trial

4   and thus was able to express his remorse and intent directly to the jury.  Moreover, the

5   record shows that defense counsel reviewed virtually the entirety of Petitioner's interview

6   with Simerson during his cross-examination.  As such, there was no need to play the

7   videotape, which would have been cumulative.  See Gonzalez, 667 F.3d at 1020.

8           C.       CLAIM THREE:  PRIOR DOMESTIC VIOLENCE

9           Petitioner's third claim for relief alleges that the trial court denied his right to due

10  process by virtue of the admission of evidence of prior domestic violence and

11  corresponding use of CALJIC No. 2.50.02, which instructs that such evidence may be used

12  to show a disposition to engage in domestic violence.

13          The prosecution sought to present evidence through Laurel that there had been a

14  prior domestic violence incident in 1997 which involved Petitioner throwing "jars and

15  things" at her.  RT 21.  Over defense counsel's objection, the trial court allowed the

16  evidence in accordance with Evidence Code § 1109.  RT 25.  In allowing the evidence, the

17  trial court found that the prior incident—which occurred about four years prior to the

18  underlying offense—was relevant to Petitioner's propensity for domestic violence and was

19  not unduly prejudicial.  RT 94-95.

20          At trial, Laurel did not testify, and therefore, the prosecution did not elicit testimony

21  regarding the 1997 incident.  During his direct examination, however, Petitioner

22  acknowledged three prior incidents where he hit her.  RT 522.  One incident occurred

23  fifteen years prior to trial when they had a "knockdown, drag-out fight."  Id.  A second

24  incident occurred about seven years prior to trial when both Petitioner and Laurel were

25  drunk and hit each other.  RT 523.  A third incident involved him throwing a jar of

26  mayonnaise against the wall causing it to splatter.  Id.  After the close of evidence, the court

27  instructed the jury pursuant to CALJIC 2.50.02 that evidence of prior domestic violence, if

28  shown by a preponderance of evidence, may be used to infer that Petitioner had a

1   disposition to commit other offenses involving domestic violence, and therefore, he was

2   likely to have committed the offense charged in Count 4 (corporal injury to a spouse).  RT

3   597-98.

4          Petitioner alleges that "CALJIC 2.50.02 and California Evidence Code section 1109

5   violate federal due process guarantees of a fair trial, because, together, they permit a jury to

6   ignore the presumption of innocence and to find guilt based on evidence that does not

7   amount to proof beyond a reasonable doubt."  Petition at 16.  The California Court of

8   Appeal flatly rejected Petitioner's claim, finding that prior appellate decisions have held

9   that the application of CALJIC 2.50.02 and California Evidence Code section 1109 does

10  not violate a petitioner's federal right to due process.  Respt. Ex. H at 14.  Though not cited

11  in the Court of Appeal's decision, the Court also notes that the California Supreme Court

12  has rejected the very argument now advanced by Petitioner.  People v. Reliford, 29 Cal.4th

13  1007, 1016 (2003).  Accordingly, the Court finds that Petitioner is not entitled to habeas

14  relief on his third claim.  See Schultz v. Tilton, 659 F.3d 941, 945 (9th Cir. 2011).

15         **D.      CLAIM FOUR:  CALJIC NO. 17.41.1**

16         Claim Four of the Petition challenges the trial court's use of CALJIC No. 17.41.1.

17  Petition at 32.  Petitioner raised this claim in the Court of Appeal, Respt. Ex. E, but did not

18  present it to the California Supreme Court on direct review, id. Ex. K, or on habeas corpus,

19  id. Ex. Q.  As such, Petitioner failed to fully exhaust this claim.  See 28 U.S.C.

20  § 2254(b)(1).  But even if he did, the claim fails on the merits.  See Brewer v. Hall, 378

21  F.3d 952, 955-57 (9th Cir. 2004) (rejecting use of CALJIC No. 17.41.1 as a basis for

22  habeas relief).

23         **E.      CERTIFICATE OF APPEALABILITY**

24         The federal rules governing habeas cases brought by state prisoners have recently

25  been amended to require a district court that denies a habeas petition to grant or deny a

26  certificate of appealability (COA) in its ruling.  See Rule 11(a), Rules Governing § 2254

27  Cases, 28 U.S.C. foll. § 2254 (effective December 1, 2009).  The Court declines to issue a

28  COA in this case, as Petitioner has not demonstrated that "jurists of reason would find it

debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." Slack v. McDaniel, 529 U.S. 473, 484 (2000).

IV.    **CONCLUSION**

For the foregoing reasons,

IT IS HEREBY ORDERED THAT the petition for a writ of habeas corpus is DENIED. The Court declines to issue a COA.  The Clerk of the Court shall enter judgment and close the file.

IT IS SO ORDERED.

Dated: March 30, 2012

_____
SAUNDRA BROWN ARMSTRONG
United States District Judge